ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>HÉCTOR ANTONIO VEGA FIGUEROA<br><br>Apelante | KLAN202400930 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.:<br>E IS2021G0004<br><br>Sobre:<br>Art. 142 (H) GRAVE (2004) |

Panel integrado por su presidente, el Juez Adames Soto[1], la Jueza Martínez Cordero y el Juez Sánchez Báez[2]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de marzo de 2026.

Compareció ante nos el Sr. Héctor Antonio Vega Figueroa (en adelante, "señor Vega Figueroa" o "apelante") mediante un recurso de *Apelación* presentado el 17 de octubre de 2024. En este, nos solicitó la revocación de una *Sentencia* emitida el 17 de septiembre de 2024, enmendada el 18 de septiembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, "foro primario" o "foro *a quo*").

Mediante esta, el foro primario declaró al apelante culpable de un cargo por violación al Artículo 142(h) de la Ley Núm. 149-2004, conocida como el *Código Penal del Estado Libre Asociado de Puerto Rico* (en adelante, "Código Penal de 2004"), *infra.* Por la comisión de dicho delito, el apelante fue sentenciado a cumplir una pena total de dieciocho (18) años de reclusión.

---

[1] Mediante la Orden Administrativa OATA-2025-070 emitida el 9 de mayo de 2025, se designó al Juez Nery E. Adames Soto en sustitución del Juez Abelardo Bermúdez Torres.
[2] Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025, se designó al Juez Isaías Sánchez Báez en sustitución del Juez Joel A. Cruz Hiraldo.

Por los fundamentos que expondremos a continuación, se **confirma** la *Sentencia* recurrida.

**-I-**

El Pueblo de Puerto Rico presentó cinco (5) denuncias contra el señor Vega Figueroa. Luego de la determinación de causa probable para acusar por ciertos delitos, el Ministerio Público presentó tres (3) acusaciones por los siguientes delitos: Artículo 142(h) del Código Penal de 2004, *infra*; Artículo 133(a) de la Ley Núm. 146-2012, según enmendada, conocida como *Código Penal de Puerto Rico*, 33 LPRA sec. 5194 (en adelante, "Código Penal de 2012"), y Artículo 59 de la Ley Núm. 246-2011, según enmendada, conocida como la *Ley para la seguridad, bienestar y protección de menores*, 8 LPRA sec. 1174 (en adelante, "Ley Núm. 246-2011").

Luego de los trámites pertinentes, el 6 de septiembre de 2023 comenzó el juicio en su fondo, el cual se extendió hasta el 21 de junio de 2024. Aquilatada la prueba presentada en el juicio, el foro *a quo*, por medio de un jurado, declaró de manera unánime al señor Vega Figueroa culpable de violar el Artículo 142(h) del Código Penal de 2004, *infra.* Por el contrario, lo encontró no culpable, de manera unánime, por violación al Artículo 133(a) del Código Penal de 2012, *supra,* y al Artículo 59 de la Ley Núm. 246-2011, *supra.* Por el delito por el cual fue hallado culpable, el tribunal lo sentenció a dieciocho (18) años de reclusión.

Inconforme, el señor Vega Figueroa recurrió ante nos mediante un recurso de *Apelación* de epígrafe y esbozó los señalamientos de error siguientes:

A. Erró el Honorable Tribunal de Primera Instancia al abusar de su discreción, ya que a pesar de que el jurado específicamente informó mediante nota la imposibilidad de ponerse de acuerdo y aun así, el Tribunal insistió en la necesidad de un veredicto unánime, cuando ya el jurado había agotado esfuerzos suficientes para llegar a un veredicto.

B. Erró el Honorable Tribunal de Primera Instancia al encontrar culpable al apelante del cargo presentado, sin el

Ministerio Público haber establecido más allá de duda razonable su culpabilidad mediante la prueba desfilada en juicio.

C. Erró el Honorable Tribunal de Primera Instancia en la adjudicación de la prueba pericial presentada por el Ministerio Público al quedar completamente impugnada la misma, no corroborándose así la versión de la alegada víctima.

Por alegarse que el foro primario erró en la apreciación de prueba oral, el apelante presentó ante esta Curia la transcripción del juicio. Esta fue estipulada por las partes el 16 de mayo de 2025. Luego de varios trámites procesales, el 20 de junio de 2025, el apelante presentó su alegato.

Por su parte, el 18 de agosto de 2025 la Oficina del Procurador General presentó el *Alegato del Pueblo de Puerto Rico*.

Con el beneficio de la comparecencia de ambas partes y de la transcripción de la prueba oral, procedemos a exponer las normas jurídicas aplicables al caso ante nuestra consideración.

**-II-**

**A. Presunción de inocencia y duda razonable**

La Constitución de Puerto Rico reconoce en la Sección 11 del Artículo II el derecho fundamental de la presunción de inocencia. Art. II, Sec. 11, Const. PR, LPRA, Tomo 1. Esto es que un acusado no tiene la obligación de presentar prueba en su defensa o de que es inocente. *Pueblo v. Meléndez Monserrate*, 214 DPR 547, 559 (2024). Entiéndase, le corresponde al Estado la obligación de presentar evidencia y de cumplir con la carga de la prueba para establecer la culpabilidad del acusado. *Pueblo v. Irizarry*, 156 DPR 780, 786-787 (2002). A los fines de rebatir esa presunción, las reglas 110 de Procedimiento Criminal y de Evidencia requieren que la culpabilidad de una persona acusada sea probada más allá de duda razonable. 34 LPRA Ap. II, R. 110 y 32 LPRA Ap. VI, R. 110. Para cumplir con ese estándar, y por consiguiente controvertir la presunción constitucional, el Ministerio Público tiene que presentar

prueba suficiente y satisfactoria sobre: (1) cada uno de los elementos del delito, (2) su conexión con el acusado y (3) la intención o negligencia criminal de este. *Pueblo v. Meléndez Monserrate*, supra, pág. 560. Cumplir con esa máxima es un imperativo del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786.

Ahora bien, el estándar probatorio de más allá de duda razonable no requiere que se tenga que probar el caso criminal con certeza matemática. *Pueblo v. Toro Martínez*, 200 DPR 834, 856 (2018); *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985). Lo que nuestro ordenamiento jurídico requiere es prueba suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, supra. Por ende, la duda razonable que impide encontrar culpable al acusado no es una mera duda especulativa o imaginaria, o cualquier duda posible; es la insatisfacción racional de la conciencia del juzgador con la prueba presentada producto de todos los elementos de juicio del caso. *Id.*, véase, además, *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Bigio Pastrana*, supra, pág. 761. Es decir, "la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". *Pueblo v. Irizarry*, supra. Como bien dispuso el Tribunal Supremo: "[e]n concreto, la duda razonable existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colón I*, 182 DPR 129, 175 (2011). De igual modo ocurre "cuando el juzgador queda insatisfecho con la prueba presentada". *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

La determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. Ahora bien, en esa delicada función revisora se debe tener presente que "la

apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, supra, págs. 788-789. Véase, además, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49 (1991). Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble. *Pueblo v. Irizarry*, supra, pág. 789.

Esta norma se fundamenta en el hecho de que "los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

De otro lado, nuestro ordenamiento jurídico no requiere una cantidad específica de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez*, supra, pág. 859. Al contrario, el testimonio de un testigo por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio aun cuando no fue un testimonio perfecto. Le corresponde al foro primario resolver los asuntos de credibilidad de un testigo cuando haya partes de su testimonio que sean aceptables. *Id.*, pág. 860. Véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De ese modo, si un testigo se contradice, lo que está en juego es su credibilidad y es al foro primario a quien le corresponde resolver el valor probatorio de su testimonio. *Pueblo v. Toro Martínez*, supra, pág. 861. Adviértase que el testimonio perfecto no existe, y en lugar de ser indicativo de la verdad, es altamente sospechosos, pues generalmente es producto de fabricación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986).

**B. Juicio por Jurado**

Es altamente reconocido que toda persona acusada de un delito grave tendrá derecho a ser juzgada por un jurado imparcial compuesto por doce (12) miembros. En específico, la Constitución de Estados Unidos dispone que, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed [...]. Emda. VI, Const. EEUU, LPRA, Tomo 1.

De igual forma, la Sección 11 del Artículo II de la Constitución de Puerto Rico establece lo siguiente:

> En todos los procesos criminales, el acusado disfrutará del derecho a un juicio rápido y público, a ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado, y a gozar de la presunción de inocencia.
>
> En los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve.

Art. II, Sec. 11, Const. PR, LPRA, Tomo 1.

En armonía con lo anterior, así lo disponen también las Reglas 111 y 112 de Procedimiento Criminal, 34 LPRA Ap. II, Rs. 111 y 112.

Según este esquema constitucional, le corresponde al jurado fungir como juzgador de los hechos. Es decir, le corresponde determinar la culpabilidad o no culpabilidad del acusado, así como el delito específico y el grado por el cual este debe responder ante la sociedad. *Pueblo v. Negrón Ayala*, 171 DPR 406, 413-414 (2007). En el desempeño de esa función, el jurado es quien aquilata la prueba desfilada y decide si le otorga credibilidad o no, para así arribar a las correspondientes determinaciones de hechos. *Pueblo v. Rosario*, 160 DPR 592, 603 (2003).

En cuanto al veredicto del jurado, a partir de *Pueblo v. Torres Rivera II*, 204 DPR 288 (2020), el Tribunal Supremo de Puerto Rico

—adoptando la norma establecida por la Corte Suprema de Estados Unidos en *Ramos v. Louisiana,* 590 US 83 (2020), mediante la cual se aclaró que la Constitución federal requiere unanimidad en el veredicto— dispuso que en Puerto Rico también es requisito que los veredictos sean unánimes en todos los procedimientos penales por delitos graves. Ello, como corolario del derecho fundamental a un juicio por jurado garantizado en la Sexta Enmienda e incorporado a los estados por conducto de la Decimocuarta Enmienda.

Posteriormente, en *Pueblo v. Centeno*, 208 DPR 1 (2021), el Tribunal Supremo de Puerto Rico aclaró que la unanimidad es requerida tanto para veredictos de culpabilidad como para los de no culpabilidad. A esos efectos, expresó lo siguiente:

> Antes de *Ramos v. Louisiana*, supra, una votación de menos de nueve votos para declarar culpable al acusado era insuficiente para lograr una convicción y causaba que el Jurado se disolviera sin lograr un veredicto (*hung jury*). En otras palabras, se disolvía el Jurado porque no se logró el número de votos requerido para que emitiera un veredicto. Ese principio permanece inalterado. Lo único que cambia es el número de votos requerido para alcanzar un veredicto. **Ahora, una votación que no sea unánime no es suficiente.** Si los doce miembros del Jurado no se ponen de acuerdo, no se logra el número de votos requerido para que el Jurado emita un veredicto. La consecuencia sigue siendo la misma: disolver el Jurado (*hung jury*). **Ante un tranque del Jurado por no lograr un veredicto unánime, el procedimiento no necesariamente culmina, sino que el acusado podría ser juzgado nuevamente**. Reiteramos, al igual que ocurre en toda la Nación, a nivel federal y estatal, esto no otorga una carga al acusado de probar su inocencia.

*Id.*, pág. 22 (énfasis suplido).

En ese sentido, la Regla 144 de Procedimiento Criminal, 34 LPRA Ap. II, R. 144, dispone que "[e]l tribunal podrá ordenar la disolución del jurado antes del veredicto en los siguientes casos: [...] (c) Si la deliberación se prolongare por un lapso de tiempo que el tribunal estimare suficiente para concluir de una manera clara y evidente no haber posibilidad de que el jurado pudiera llegar a un acuerdo".

En torno a la disolución de un jurado por la tardanza en alcanzar a un veredicto, el Tribunal Supremo se expresó en *Pueblo*

*v. Vélez Díaz,* 105 DPR 386 (1976). En ese caso, el jurado comenzó a deliberar a las 4:45 p.m. y regreso a sala en tres ocasiones —6:00 p.m., 6:35 p.m. y 9:00 p.m.— para informar que no habían llegado a un acuerdo. En cada una de esas ocasiones, el juez de instancia les ordenó continuar deliberando. A las 11:00 p.m. el jurado recesó y fue hospedado en un hotel. Al día siguiente, comenzaron a deliberar a las 10:23 a.m. y emitieron un veredicto de culpabilidad a las 11:00 a.m.

Ante esos hechos, el Tribunal Supremo de Puerto Rico concluyó que el foro primario no se excedió en sus funciones, pues es dicho foro el que se encuentra en mejor posición para determinar si se justifica o no disolver el jurado. Resolvió que el jurado deliberó por menos de siete horas, cuando jurisprudencia de Estados Unidos ha permitido deliberaciones que fluctúan entre dos (2) horas y hasta treinta y nueves (39) horas y media, dependiendo de la complejidad del caso. Incluso, se reconoció que el tribunal puede ordenar al jurado continuar deliberando si estima que aún existe posibilidad de que se alcance un acuerdo.

De igual forma, en *Pueblo v. Reyes Herrans*, 105 DPR 658, 665 (1977), nuestro más Alto Foro expresó lo siguiente:

> **El disolver un jurado apenas ha comenzado a deliberar, plantea serias cuestiones en la administración de la justicia.** Los jueces deben tener presente lo expresado en *Lugo v. Tribunal Superior*, 99 D.P.R. 244, 251 (1970), al efecto de que '[e]l que se rinda un veredicto beneficia al Estado y al acusado por igual. El Estado se beneficia porque no tiene que incurrir en el esfuerzo y los gastos que un nuevo juicio conlleva, además de que no se aumenta la congestión del calendario. El acusado se libra de tener el agobio de una acusación pendiente y los gastos y molestias que entrar de nuevo a juicio conlleva', **y en los casos que lo ameriten debe instruir al jurado para que continúe deliberando y trate de llegar a un veredicto, y sólo deben disolverlo cuando se convenzan de que es imposible para el jurado ponerse de acuerdo**.

(Énfasis suplido).

Además, obsérvese que *Lugo v. Tribunal Superior*, 99 DPR 244 (1970), el Tribunal Supremo determinó que, si un Jurado apenas

había tenido tiempo para comenzar sus deliberaciones, procedía que el juez le instruyera para que siguieran deliberando. Apuntó que lo importante es que, al instruirlos, el jurado no sea coaccionado para que lleguen a un veredicto.

Por otro lado, el veredicto emitido por un jurado merece el mismo respeto y deferencia que el fallo emitido por un tribunal de derecho. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 914 (2024). Ello obedece a que el jurado es "el más indicado para otorgar credibilidad y dirimir conflictos de prueba", ya que "[s]on estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos". *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez*, 121 DPR 791, 806 (1988).

Por ello, esta Curia solo intervendrá con la apreciación de los miembros del jurado cuando medie error manifiesto, pasión, perjuicio o parcialidad. *Pueblo v. Negrón Ramírez*, supra, págs. 913-914; *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995).

Cónsono con lo anterior, el Tribunal Supremo de Estados Unidos también ha otorgado gran deferencia a los veredictos rendidos por un jurado. A modo ilustrativo, en *Jackson v. Virginia*, 443 US 307, 318-319 (1979), dicho Foro estableció el conocido estándar de revisión para evaluar la suficiencia de la prueba en casos criminales:

> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S., at 282 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana*, 406 U.S., at 362. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

(Énfasis en el original).

De este modo, este Foro Apelativo solo intervendrá con la apreciación de un jurado que haya resultado en un veredicto condenatorio cuando de la prueba surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR, 545, 551 (1974). Por consiguiente, no se descartarán ni se sustituirán las determinaciones del jurado de manera arbitraria, salvo que de la prueba presentada se desprenda que estas carecen de fundamento para ser sostenidas. *Pueblo v. Acevedo Estrada*, supra, pág. 99; *Pueblo v. Maisonave Rodríguez*, supra, pág. 62.

En otras palabras, "a menos que existan los elementos antes mencionados y/o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo *deberá abstenerse* de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos". *Pueblo v. Acevedo Estrada*, supra, pág. 99; *Pueblo v. Maisonave Rodríguez*, supra, pág. 63.

## C. Instrucciones al jurado

Dado que el jurado está compuesto por personas que, por lo general, no poseen conocimiento especializados del ordenamiento jurídico, es necesario que sean debidamente instruidos —por el juez que preside los procedimientos— respecto al derecho aplicable. Así, las instrucciones al jurado constituyen el mecanismo mediante el cual este adviene en conocimiento del derecho que debe aplicar al deliberar. *Pueblo v. Negrón Ayala*, supra, pág. 414.

Dichas instrucciones revisten particular importancia, toda vez que el acusado tiene derecho a que se le trasmitan al jurado todos los aspectos de derecho que, conforme a cualquier teoría razonable, pudieran ser pertinentes para sus deliberaciones. Ello es así aun cuando la prueba presentada por la defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Rodríguez Vicente*, 173 DPR 292, 298 (2008). En esa encomienda de instruir al jurado, el juez tiene el deber ineludible de velar que las instrucciones impartidas sean correctas, claras, precisas y lógicas. *Pueblo v. Colón González*, 209 DPR 967, 987 (2022). De no impartirse las instrucciones apropiadas, el veredicto podría no ser uno justo. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 95 (2000).

A los fines de cumplir con dicho mandato, la Regla 137 de Procedimiento Criminal dispone como sigue:

> Terminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que estas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular estas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.

34 LPRA Ap. II, R. 137.

Aunque la referida regla impide que se alegue como error instrucciones que no hayan sido objetadas ni solicitadas por escritos, el Tribunal Supremo ha reconocido que "si las instrucciones que efectivamente transmitió el tribunal a los señores del jurado, o aquellas que omitió transmitir, 'lesionan derechos fundamentales del acusado', éste en apelación puede levantarlo como error a pesar de no haberlas objetado oportunamente". *Pueblo v. Ortiz Martínez*, 116 DPR 139, 151 (1985) (citas omitidas). Para evaluar la impugnación realizada, procede considerar las instrucciones en su totalidad, a fin de determinar si, en conjunto, resultan correctas o incorrectas.

En aras de facilitar la tarea de impartir instrucciones al jurado, el 25 de marzo de 2022, el Tribunal Supremo aprobó el *Libro de Instrucciones al Jurado*. *In re Aprobación del Libro de Instrucciones al Jurado*, 208 DPR 1042 (2022). La utilización de dicho libro es discrecional; sin embargo, se considera una buena práctica judicial, pues contribuye a reducir la posibilidad de error y a promover mayor uniformidad en la administración de la justicia. Las instrucciones impartidas conforme a dicho manual gozan de una presunción de corrección, y quien las impugne tiene el deber de demostrar afirmativamente que son erróneas. *Pueblo v. Colón González*, supra.

En lo concerniente a los veredictos, la Instrucción 26.2 del referido manual dispone que el foro primario debe indicarle al jurado que "[p]ara que sea válido un veredicto, tiene que ser unánime. Es decir, todos y todas deben estar de acuerdo en declarar no culpable o culpable a la persona acusada (en cada uno de los cargos)".

Por otro lado, en *Allen v. United States*, 164 US 492 (1896), la Corte Suprema de Estados Unidos avaló la utilización de ciertas instrucciones suplementarias dirigidas a un jurado que no ha logrado alcanzar un veredicto debido a un *impasse* (*deadlock*), es decir, ante la realidad que no pudieron llegar a un veredicto u otro.

Estas instrucciones —conocidas como *Allen charge*— tienen el propósito de exhortar a los miembros del jurado a reconsiderar sus posturas y continuar deliberando con miras a alcanzar un veredicto, siempre que ello sea posible sin violentar sus convicciones individuales.

Particularmente, dicho foro judicial resumió las instrucciones de la siguiente manera:

> These instructions were quite lengthy, and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, unon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Id.*, pág. 501.

Dichas instrucciones han sido definidas como "[a] supplemental jury instruction given by the court **to encourage a deadlocked jury, after prolonged deliberations, to reach a verdict**". Black's Law Dictionary (10th ed.2014) (énfasis suplido). Al avalarlas, la Corte Suprema señaló que el propósito del sistema de jurado es propiciar la comparación de puntos de vista y el intercambio de argumentos entre sus miembros con el fin de alcanzar un veredicto unánime. Así, sostuvo que cada jurado debe escuchar con deferencia los argumentos de los demás y examinar críticamente su propio criterio cuando se encuentre en desacuerdo con la mayoría. *Allen v. United States*, supra, págs. 501-502.

Tal instrucción fue respaldada posteriormente en *Lowenfield v. Phelps*, 484 US 231 (1988). En dicho caso, la Corte Suprema de Estados Unidos indicó que para determinar si un jurado fue

coaccionado requiere considerar la instrucción suplementaria dada por el foro primario en su contexto y bajo todas las circunstancias. Así concluyó que, dado que las instrucciones dadas en *Allen* fueron válidas, igualmente se permiten las que no hacen referencias a jurados en minorías, como las realizadas por el juez en ese caso.[3]

En contraste, en *Jenkins v. United States*, 380 US 445 (1965), la Corte Suprema concluyó que el tribunal de instancia incurrió en coacción indebida al instruir al jurado que "You have got to reach a decision in this case", luego de que este informara, tras dos horas de deliberación, que no podía alcanzar un veredicto debido a la falta de pruebas.

Por su parte, todas las Cortes de Apelaciones federales han avalado variantes de instrucciones suplementarias dirigidas a jurados que enfrentan un *impasse*. Véase, *Lowenfield v. Phelps*, supra, pág. 238, n.1. En lo que concierne al Tribunal de Apelaciones del Primer Circuito, aplicable a Puerto Rico, este ha aprobado versiones modificadas de las *Allen charge. United States v. Nichols*, 820 F.2d 508, 511-512 (1st Cir. 1987). Según dicho foro, estas instrucciones pueden ofrecerse cuando el jurado ha llegado a un punto muerto en sus deliberaciones y se pretende fomentar la continuación de estas con miras a alcanzar un veredicto.

---

[3] Las instrucciones dadas por el juez fueron las siguientes:

> Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Lowenfield v. Phelps*, supra, pág. 235.

No obstante, dado su potencial carácter coercitivo, tales instrucciones deben cumplir con ciertos requisitos mínimos: (1) comunicar la posibilidad de que tanto la mayoría como la minoría del jurado reexaminen sus posturas; (2) reafirmar la obligación del Estado de probar la culpabilidad más allá de duda razonable; e (3) informar al jurado que, aun tras deliberar, podrían no alcanzar un veredicto unánime. *United States v. Peake*, 804 F.3d 81, 98 (1st Cir. 2015); *United States v. Angiulo*, 485 F.2d 37, 39 (1st Cir. 1973).

Asimismo, dicho foro ha señalado que resulta apropiado impartir este tipo de instrucciones cuando el jurado informa que se encuentra en un *impasse* luego de varias horas de deliberación — por ejemplo, entre seis (6) y nueve (9) horas distribuidas en dos (2) días—, pero que podría resultar prematuro hacerlo cuando apenas han deliberado durante unas pocas horas y no han manifestado dificultades para alcanzar una decisión. *United States v. Nichols*, supra; *United States v. Vanvliet*, 542 F.3d 259, 269 (1st Cir. (2008); *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir. 1971). De igual manera, en *United States. v. Peake*, supra, pág. 99 n.13, dictaminó que sería prematuro impartir tales instrucciones luego de solo varias horas de deliberación durante un día y el próximo día fue completo de deliberación, cuando el jurado apenas había enviado dos notas al tribunal.

Ahora bien, las *Allen charge* y el requisito de que contengan lenguaje atenuante dirigido a evitar la coacción aplican únicamente cuando el tribunal determina que el jurado se encuentra efectivamente en un *impasse* (*deadlocked).* Por el contrario, si el juez entiende que el jurado aún no se encuentra estancado en sus deliberaciones, no es necesario que las instrucciones incluyan ese lenguaje neutralizador. *US v. Figueroa-Encarnación*, 343 F.3d 23, 32 (2003).

En ese caso, el Primero Circuito validó ciertos comentarios realizados por el juez de distrito y concluyó que estos no reflejaban que el tribunal entendiera que el jurado estuviese en un *impasse*.[4] Asimismo, destacó que la instrucción impartida —dirigida a que el jurado continuara deliberando— no contenía los elementos coercitivos característicos de una *Allen charge*, sino que simplemente buscaba exhortar a los jurados a continuar el esfuerzo por alcanzar un veredicto unánime. En ese contexto, también citó a *United States v. Properi*, 201 F.3d 1335 (2000), caso en el cual se validó una instrucción dirigida a que el jurado continuara deliberando, particularmente cuando el tribunal desconocía la composición del veredicto preliminar. Allí se concluyó que nada en la instrucción sugería que el tribunal deseara o requiriera un resultado específico, por lo que no resultaba inherentemente coercitiva.

**D. Agresión sexual**

El Artículo 142(h) de la Ley Núm. 149-2004, conocida como el *Código Penal del Estado Libre Asociado de Puerto Rico* (en adelante, "Código Penal de 2004") tipifica el delito de agresión sexual de la manera siguiente:

> Toda persona que lleve a cabo una penetración sexual, sea vaginal, anal, orogenital, digital o instrumental, en cualquiera de las circunstancias que se exponen a continuación incurrirá en delito grave de segundo grado severo:

---

[4] El comentario del juez ocurrió luego de cuatro (4) horas de deliberación y ante el hecho de que el jurado le envió una nota al tribunal. El juez expresó lo siguiente:

> The court received a note from you that basically says that you have not been able to reach an agreement. And you also state that even if you deliberate more time you're not going to reach an agreement.
>
> Well, after a 12 day trial some days we worked eight hours, some days we only worked four hours. But it's still 12 days of receiving evidence. **I think it is too premature for the judge after 12 days of receiving evidence to accept that there is a deadlock. These matters do occur, and they occur sometimes more times than we would like, but they occur.**
>
> So, what the Court is going to do is to send you home, relax, not think about the case and come back tomorrow at 9:30 AM and at which time I will provide you an instruction. Please do not begin any deliberation until you come back here tomorrow morning.

[...]

(h) Si el acusado tiene una relación de parentesco con la víctima, por ser ascendiente o descendiente, por consanguinidad, adopción o afinidad, o colateral por consanguinidad o adopción hasta el tercer grado.

[...].

33 LPRA sec. 4770.

Conforme al Artículo 16 del Código Penal de 2004, 33 LPRA sec. 4644, la pena correspondiente a este delito fluctúa entre quince (15) años y un día y veinticinco (25) años de reclusión

Nuestro Tribunal Supremo ha sostenido condenas por el delito de agresión sexual aun cuando no se haya demostrado, mediante exámenes médicos, la presencia de laceraciones o semen en el cuerpo de la víctima. Incluso, ha expresado que ni siquiera es indispensable probar la ruptura del himen. Véase, de manera persuasiva, *Pueblo v. Pérez Rivera,* 129 DPR 306, 316-317 (1991) (Sentencia). El elemento de acceso carnal puede demostrarse más allá de duda razonable mediante otro tipo de prueba, incluyendo el testimonio de la víctima. *Id.*

Discutido el derecho aplicable, este Tribunal se encuentra en posición de atender las controversias planteadas en el recurso de *Apelación.*

**-III-**

El señor Vega Figueroa formuló tres señalamientos de error en su recurso de *Apelación.* En el primero, cuestiona que el foro primario haya insistido, mediante instrucciones al jurado, en la necesidad de alcanzar un veredicto unánime, a pesar de que — según su entender— el jurado informó mediante una nota que le resultaba imposible ponerse de acuerdo y que había agotado esfuerzos suficientes para llegar a un veredicto.

En particular, cita de forma persuasiva el caso del estado de Louisiana, *State v. Nicholson,* 315 So. 2d 639 (1975), en el cual se rechazó expresamente la utilización de las instrucciones conocidas

como *Allen charge* y sus variantes. De igual manera, hace referencia al caso *State v. Bracken,* 2023 KA 0782 (2024), del Tribunal de Apelaciones del estado de Louisiana, el cual reiteró dicha prohibición. A base de ello, argumenta que, dado que el derecho penal de Puerto Rico tiene raíces históricas en el derecho del estado de Louisiana, dicha prohibición debe considerarse aplicable en nuestro ordenamiento. Finalmente, sostiene que las instrucciones impartidas por el foro primario tuvieron un efecto coercitivo sobre el jurado, en violación al debido proceso de ley, lo cual provocó el veredicto condenatorio.

Por su parte, la Oficina del Procurador General alega que las instrucciones impartidas por el foro primario no ejercieron presión indebida sobre el jurado. Señala que el apelante no ha demostrado, ni siquiera *prima facie*, que dichas instrucciones hayan provocado el veredicto emitido. Además, destaca que el juez de instancia compartió posteriormente con las partes un borrador de una posible *Allen charge*, únicamente para el caso de que fuera necesario impartirla. Asimismo, sostiene que no puede considerarse que el jurado hubiese agotado esfuerzos razonables de deliberación tras apenas cuatro horas de deliberación, por el mero hecho de haber enviado dos notas al tribunal.

De entrada, conviene señalar que el apelante sustenta principalmente su argumento en dos decisiones del estado de Louisiana: *State v. Nicholson*, supra, del Tribunal Supremo de ese estado, y *State v. Bracken*, supra, del Tribunal de Apelaciones. Sin embargo, siete días después de que el apelante presentara su alegato ante este foro, el Tribunal Supremo de Louisiana emitió su decisión en *State v. Bracken*, 413 So.3d 429 (2025), mediante la que revocó al tribunal apelativo y, además, derogó expresamente la norma establecida en *State v. Nicholson*, supra.

En dicha decisión el Tribunal Supremo de Louisiana resolvió que una prohibición absoluta de las *Allen charge* no resulta adecuada. Por el contrario, sostuvo que las versiones modernas y modificadas de dichas instrucciones pueden servir para fomentar la deliberación del jurado y promover una administración judicial eficiente. Al así resolver, tomó en consideración que la gran mayoría de los estados de Estados Unidos —con excepción de cuatro— y los circuitos de apelaciones federales permiten el uso de estas instrucciones, ya sean en su versión tradicional o modificada. Aclaró, no obstante, que lo determinante es que las instrucciones impartidas no resulten coercitivas ni que promuevan la condena, lo cual debe evaluarse a la luz de la totalidad de las circunstancias.

A esos efectos, este tribunal descarta el argumento del apelante de acoger lo dictaminado por el Tribunal Supremo de Louisiana de prohibir el *Allen charge*. Ello es particularmente así cuando dicho foro abandonó la jurisprudencia en la cual el apelante fundamenta su planteamiento.

Además, aun cuando el Tribunal Supremo de Puerto Rico no se ha expresado directamente sobre la aplicabilidad de las *Allen charge* en nuestra jurisdicción, no encontrados fundamentos para prohibirlas categóricamente. Como bien señaló el Tribunal Supremo de Louisiana, tanto la Corte Suprema de Estados Unidos como los tribunales apelativos federales y la mayoría de los estados permiten el uso de este tipo de instrucción suplementaria, siempre que no resulten coercitivas.

Asimismo, nuestro Tribunal Supremo ha reconocido reiteradamente que la disolución prematura de un jurado es una medida que debe evitarse cuando aún existe la posibilidad de que se alcance un veredicto. Véase, *Pueblo v. Reyes Herrans*, supra, *Pueblo v. Vélez Díaz*, supra, y *Lugo v. Tribunal Superior*, supra. En esas decisiones se ha enfatizado que los tribunales deben exhortar a los

jurados a continuar deliberando y a intentar alcanzar un veredicto, y que la disolución del jurado procede únicamente cuando el tribunal se convence de que resulta imposible que los miembros del jurado logren ponerse de acuerdo.

Ahora bien, un requisito de umbral para la aplicación de una *Allen charge* es que el jurado se encuentre en un verdadero *impasse* (*deadlock*). Es decir, que haya manifestado claramente que no puede alcanzar un veredicto. Sin embargo, esa no es la situación ante nos.

Al examinar el tracto procesal de las deliberaciones, la nota enviada por el jurado —la cual preguntaba: "En caso de que no haya unanimidad, en algunos de los casos, y no haya disposición de reevaluar su decisión por algún jurado, ¿Qué procedería?"— no puede interpretarse como una manifestación inequívoca de que el jurado se encontraba en un punto muerto. Por el contrario, la nota plantea una situación hipotética: qué ocurriría en el supuesto de que no se alcanzara unanimidad. La redacción misma de la nota — "en caso de que" y "¿qué pasaría?"— demuestran que el jurado no estaba afirmando que hubiese alcanzado un *impasse,* sino que formulaba una pregunta procesal sobre una posible eventualidad.

Por consiguiente, al no existir evidencia clara de que el jurado estuviese efectivamente dividido o estancado en sus deliberaciones, no era necesario aplicar las salvaguardas particulares asociadas a una *Allen charge.*

En la alternativa, el apelante argumenta que las instrucciones impartidas por el juez del foro primario resultaron coercitivas y ejercieron presión indebida sobre el jurado, en violación al debido proceso de ley. No le asiste la razón.

Este Tribunal ha examinado detenidamente las instrucciones impartidas por el foro primario y concluye que en ningún momento estas coaccionaron al jurado para emitir un veredicto unánime ni mucho menos para alcanzar una decisión en particular.

En cuanto al requisito de unánime, el foro primario instruyó al jurado de la siguiente manera:

> **Para que el veredicto del jurado sea válido tiene que ser unánime.** Es decir, todos eh, deben estar de acuerdo en declarar no culpable o culpable a la persona acusada, en cada uno de los cargos. Ustedes indicarán en el formulario el resultado de la votación, pero en ningún momento deberán ustedes explicar cómo votaron individualmente. De acuerdo con la apreciación que ustedes hagan de la evidencia, ustedes pueden decidir si la persona acusada es culpable o no culpable de todos los cargos que se le imputan, o pueden decidir si es culpable en unos cargos y no culpable en otros.[5]

(Énfasis suplido).

Tras ello, el abogado del señor Vega Figueroa cuestionó que no se indicara como parte de la instrucción el hecho de que no están obligados a llegar a un veredicto. De esa forma, expresó lo siguiente:

> **LCDO. MOJICA:** La otra, para estar en récord. Sabemos ya la, lo que va determinar el Tribunal, pero para estar en récord. Es que, entendemos con mucho respeto que, el jurado en, en las instrucciones que usted ha dado, le ha indicado al jurado que para que sea un veredicto valido eh debe concurrir doce persona...deben co... ser forma unánime. Y nosotros entendemos con mucho respeto que esa es la situación que debe ser forma unánime y que deben hacer el esfuerzo necesario para llegar a una conclusión, pero que no están obligados, a llegar a un veredicto.
>
> **JUEZ:** Bueno, si fuera necesario más adelante, dar una instrucción sobre ese particular, lo haríamos.
>
> **LCDO. MOJICA:** Okey.
>
> **JUEZ:** Por ahora es innecesario. Bien. Pues el tribunal siendo las diez y veintidós, vamos a recesar.[6]

Dicha instrucción impartida por el foro primario es sustancialmente idéntica a la Instrucción 26.2 del *Libro de Instrucciones al Jurado*. Por tanto, goza de una presunción de corrección, la cual el apelante no ha logrado rebatir. Por tanto, la validamos.

De otro lado, el jurado empezó a deliberar a las 10:17 a.m. Sin embargo, a las 12:09 p.m. el tribunal atendió una primera pregunta del jurado, la cual era la siguiente: "Las decisiones de deliberación de culpabilidad es por unanimidad. ¿Las de no culpable, tienen que

---

[5] Transcripción de la prueba oral (en adelante, "TPO"), Tomo 2, pág. 1117, líneas 1-14.
[6] *Id.*, pág. 1121, líneas 7-33.

ser por unanimidad?".[7] Debido a eso, la defensa insistió en su objeción a la instrucción:

> **LCDO. MOJICA:** Sí Juez, pero yo, per...perdóneme, perdóneme. Déjeme organizar. Fíjese que la pregunta es, que pa' culpable se, se, tiene que ser unanimidad, y si pa' lo otro también tiene que ser por unanimidad. Y, y estamos claro que eso es lo que dice la ley, lo que, lo dice el Supremo hasta ahora. Pero fíjese, an...la última solicitud que yo le hice cuando salimos de aquí, fue, que sí que se le, que sí, que, que continúen, y que hagan todos sus esfuerzos. Pero que, si no, si, si no llegaran de acuerdo pues la, la ley provee pa' otro remedio y punto y se acabó. O sea, no podemos obligarlos también a que sea unánime. O sea, no podemos obligar a que un voto se cambie para, para, para cumplir con uno de los, de los dos, de los dos...

> **JUEZ:** ¿Pero de donde usted concluye que el Tribunal los está obligando? Simplemente es una pregunta, que hizo el jurado y...

> **LCDO. MOJICA:** Perdo... perdóneme Juez.

> **JUEZ:** ... se la vamos a contestar.

> **LCDO. MOJICA:** Discúlpeme Juez. Tengo como, perdóneme. Pero tengo, problemas de comunicación con usted, de verdad. Yo no estoy diciendo, si lo dije no es lo que quise decir. Estoy diciendo es...

> **JUEZ:** No, pero usted utilizó la palabra "obligando."

> **LCDO. MOJICA:** Que se puede entender to' el jurado, to' el jurado que tiene, cuando digo "obligando" es, que tienen que tomar una decisión, ya sea man...por unanimidad pa' lo uno, pa' lo otro, obligao', o sea, cuando digo "obligado" es que tiene que tomar esa decisión. No le damos la alternativa o, o decirle, "ustedes deben Ile...seguir bregando y llegan... para tratar de, de llegar a, a un acuerdo." "Pero, si no pueden, pues si, así mismo se lo manifiestan al Tribunal." Y el Tribunal re...tendrá unos remedios con relación a eso.

> **JUEZ:** Ya, ya yo le expliqué compañero, en su momento si fuera necesario dar una instrucción a esos efectos, el Tribunal la dará. Estamos apenas empezando. Ellos se fueron a deliberar hace minutos. Hicieron simplemente una pregunta de derecho, que se le puede contestar fácilmente, y eso es lo que va hacer el Tribunal...

> [...]

> **JUEZ:** Bien. Buenos damas, caballeros, han sido traídos a sala porque es que me, eh se trajo a mi atención una pregunta que tiene el jurado y que comunicaron a través del señor Presidente, por, por un escrito, en el registro de comunicación del Jurado. Se las voy a leer para beneficio de todos. Y dice "Las decisiones de deliberación de culpabilidad es por unanimidad. ¿Las de no culpable, tienen que ser por unanimidad?" pregunta. La respuesta es sí. La respuesta es en la afirmativa. La decisión del jurado, sea cual sea, culpable o no culpable, tiene que ser por unanimidad, doce a cero. Si no, no vale. Así que esa es la respuesta sencilla. ¿Duda? Todo claro. Okey. Pues entonces se les ordena que

---

[7] *Id.*, pág. 1124, líneas 25-28.

sigan deliberando, creo que van ahora almorzar, pero luego de eso, pues entonces sigan ustedes deliberando. Excusados.[8]

Posteriormente, a las 3:30 p.m. el tribunal comunicó que el jurado envió otra nota que suscitó la misma objeción de la defensa:

> **JUEZ:** Bien. Bueno, los llamé a sala porque eh, el jurado envió otra, otra comunicación escrita, para el Tribunal. En esta ocasión es, también una pregunta, y se las voy a leer textualmente. "En caso de que no haya unanimidad, en algunos de los casos, y no haya disposición de reevaluar su decisión por algún jurado, ¿Qué procedería?" Es la pregunta que hace el jurado. Así que, el Tribunal va a llamar al Jurado a sala para darle, otra instrucción adicional. Están listos.
>
> [...]
>
> **LCDO. MOJICA:** Esa instrucción eso, entiendo que se trata del mismo proceso, habíamos solicitado en dos ocasiones. De, de que se instruyera...
>
> [...]
>
> **LCDO. MOJICA:** ¿perdón? De que se le instruyera, eh precisamente para eso. que, que, que, que podían, su Señoría mandarlos veinte mil veces ahí, pero que se le instruyera, por lo menos, que no estaban, no están, lo que, la posición mía Juez, es que ellos no se vean forzado a que tiene que ser por unanimidad. Que, que tienen que llegar a un veredicto unánime.
>
> **JUEZ:** Yo creo que es, es muy temprano para entrar en esas conclusiones. Eh...¿a?
>
> **FISCAL RIVERA:** Pe...permiso para acercarnos un poco mas, para no esforzar tanto...
>
> **JUEZ:** Sí. Adelante.
>
> **FISCAL RIVERA:** ...la voz. Es que, precisamente esa controversia, ya ha sido atendida, incluso por el foro eh, El Tribunal Supremo Federal, cuando ha decidido que hay unas instrucciones particulares que se le pueden impartir al jurado, de que deben continuar, deliberando, que son los "allan charge" en el sentido de que, es su deber continuar de...deliberando hasta llegar a un a, ¿Verdad? un ejercicio, sano, que el Tribunal se convenza de que ya no es viable eh, ningún acuerdo.
>
> **LCDO. MOJICA:** Juez, lo que pasa es que, eh, conozco a la saciedad, y perdóneme la expresión. Lo que ha determinado el Tribunal Federal. Estamos claro. Pero yo también tengo que, plantearlo Juez, porque, en cualquier caso, en, en cualquier foro apelativo de no surgir las cosas como nosotros entendemos, no podemos plantearlo, en un foro apelativo si no lo planteamos acá abajo. ¿Verdad? Independientemente si usted dice que "no ha lugar", pues no ha lugar, no hay problema. Lo que estamos diciendo que esta es la tercera vez que lo decimos es, que no impartir esa instru...ay perdón Juez. Se está moviendo de sitio. El no impartir la, el no impartir esa instrucción Juez, podría llevar a la mente del Jurado, de que, tienen que llegar a un veredicto. Y eso no es

---

[8] *Id.*, págs. 1122-1124.

cierto. O sea, en ningún sitio de la dete...de las decisiones se dice que hay que llegar a un veredicto, y no...y nosotros lo que queremos adelantándonos a eso, por tercera vez le decimos, al Tribunal, que ellos deben saber Juez, yo no tengo objeción a que su Señoría lo siga enviando a deliberar hasta las doce de la noche. No tenemos problema con eso. pero que se le haga claro, que, que no de ellos o dos de ellos, o tres de ellos no tienen que ceder, o, o por salir del, del paso, lo que sea, este, puede mantenerse en su posición y hay unos remedios en ley que el Tribunal pro... en su momento proveerá. Si fuera necesario. Esa es nuestra posición.

**JUEZ:** Bien. Me parece que es muy temprano todavía en el proceso para dar un, "allan charge" una instrucción bastante, drástica y que, eh, se hará en caso que es totalmente necesaria. Este caso estamos empezando, este jurado se fue a deliberar a eso de las, once y pico de la mañana, me parece. O sea que a, a, llevan apenas unas horas. Así que me parece que es prematuro, así que, no se va a dar esa instrucción ahora...

**LCDO. MOJICA:** Esta bien Juez.

**JUEZ:** ... según ha sugerido la fiscal...

[...]

**JUEZ:** Sí, sí. Vamos a, pues, a instruir al jurado y, ordenarle que sigan deliberando. Que la función de ellos...

[...]

**JUEZ:** ...es tratar de ponerse de acuerdo. Pueden sentarse todos. [...]

[...]

**JUEZ:** Bien. Pues hemos traído a las damas y caballeros del jurado eh ya que, eh, del jurado por conducto de su Presidente, remitió otra pregunta por escrito, dentro del formulario que proveemos para eso. y voy a leer la pregunta en voz alta, para beneficio de todos. "En caso de que no haya unanimidad en algunos de los casos, y no haya disposición de reevaluar su decisión por algún jurado, ¿Qué procedería?" Bien. Es todavía damas y caballeros del jurado muy temprano, en el proceso, para tomar una decisión sobre qué hacer ante esa situación. Eh, este juicio ha sido uno, bastante largo, nos ha tomado meses. Eh, han sido muchos testigos. Ha sido un caso complejo. Y, yo no espero que ustedes tomen una decisión en pocas horas. Eh, ustedes pueden, y deben tomarse todo el tiempo que sea necesario para deliberar, para tratar de ponerse de acuerdo, con un veredicto unánime. Yo les voy a pedir a ustedes, que regresen al salón de deliberaciones y discutan toda la prueba que se presentó. Repasen uno a uno el testimonio de todos los testigos que se sentaron aquí a declarar. Y, si ustedes, o alguno de ustedes, entiende que tiene la necesidad de volver a escuchar, alguno de esos testimonios, o todos los testimonios, o alguna parte de uno, o alguna parte de todos, siéntanse en la libertad de así pedirlo. Eh, aquellos de ustedes que tengan una opinión, pues discútanla, y explíquense a sus compañeros. Explíquese la razón de esa decisión que ustedes tienen, o esa opinión particularmente, a los compañeros que tienen una opinión distinta. Y, aquellos que tienen esa opinión distinta, también discútanla con sus demás compañeros y explíquenle por que, el porqué

de su opinión. De eso es de lo que se trata eh, precisamente el proceso de deliberación. Y, mediante ese, ese ejercicio de discutir y escuchar las opiniones de todos y cada uno de ustedes, es posible que ustedes entonces vean algo, que no habían visto antes. Que consideren algo que no habían considerado. Que decían, decidan darle un peso distinto a algo que habían visto pero que no le había visto ese peso. Y de esa manera pueda darse, un veredicto unánime. Y con eso en mente yo los exhorto, que eh, eh hagan ese ejercicio. Vayan al salen...salón deliberaciones, sigan esas instrucciones, y hagan lo posible por llegar a un veredicto unánime, en este caso. Quedan excusados por ahora.

[...]

**LCDO. MOJICA:** Nosotros creemos con, simplemente, simplemente para que quede, conste en récord. Que, y, y obviamente va a estar en récord la, la pregunta de la, de los damas y caballeros del jurado, ¿Verdad? Pero queremos llamar la atención, pa' cualquier situación futura de que el jurado ha sido muy claro. De que, de que, de que hay una persona que tiene una deter...una determinación irreversible, llaman ellos. Irreversible. Y queremos llamar la atención a ese hecho en particular Juez.

**JUEZ:** Eh, irreversible es una palabra que utilizó usted, pero entiendo su fundamento. Y, y esta consignado.

**LCDO. MOJICA:** Sí, está bien Juez. Pero perdóneme. Fue que lo entendí así, ¿Qué palabra usaron ellos? Discúlpeme.

**JUEZ:** Lo, lo he leído varias veces, pero dicen "que no haya una disposición de reevaluar."

**LCDO. MOJICA:** Perdóneme. Pues discúlpeme. Pues, fue, la mala mía, está bien. Discúlpame.

**JUEZ:** Yo los he instado a ellos...

**LCDO. MOJICA:** De, de reevaluar. Sí, sí.

**JUEZ:** ...precisamente a reevaluar.

**LCDO. MOJICA:** A que reevalúen. No, estamos claro Juez.

**JUEZ:** A que discutan. Pa' un lado o pal'...

**LCDO. MOJICA:** O pal' otro, porque no sabemos.

**JUEZ:** ... otro, porque a mí no me interesa eso, eh, esa es decisión del jurado.

**LCDO. MOJICA:** Sí, Juez. Y no sabemos, o sea, eso no... ¿Juez, volvemos a nuestra oficina entonces?

**JUEZ:** No. Vengan un momentito, porque quiero entonces, adelantar unas cositas, en caso de que...

(SE ACERCAN AL ESTRADO)

**JUEZ:** Este es el "allen charge" al que se refirió la fiscal. Anticipándonos al futuro, yo no digo que haya, vaya haber que darlo, pero si hubiera que darlo, pues se los entrego, con su traducción al español, pa' que ustedes eh, lo vean. Y si hubiera que darlo, pues esa es la instrucción, que daría. Como he hecho en otras, en otras, con otras instrucciones

que no están en el libro, pues se las he dao' por escrito. Quería dárselas también, pa' que la tengan. Eso eh, eso tiene una jurisprudencia, eso es de Allen versus United States, ciento sesenticuatro "U" "S" cuatro, nueve, dos, no me la estoy inventando yo. Este, así que, pues esa es la que, de ser necesario estaremos dando. Pa' que la tengan de antemano.[9]

Como consecuencia de esas instrucciones suplementarias, el señor Vega Figueroa alega que el tribunal coaccionó y presionó al jurado para llegar a un veredicto. La realidad es que no hubo tal coacción.

Al examinar ambos eventos en los que el tribunal contestó unas preguntas al jurado, este tribunal concluye que ciertamente, aunque hubo unas instrucciones suplementarias, en ningún momento el foro primario los obligó a tomar una decisión en particular. Nótese que la primera pregunta estaba únicamente relacionada con si era necesario unanimidad para un veredicto de no culpabilidad.

Por su parte, en respuesta a la segunda pregunta, el tribunal fue enfático en que era muy temprano para tomar una decisión sobre qué hacer ante la situación de un desacuerdo. De esa manera, entendió que aún existía la posibilidad de que el jurado llegase a un veredicto. Así pues, les ordenó a continuar deliberando y, en ese sentido, los invitó a tratar de ponerse de acuerdo con un veredicto unánime. Para ello, les explicó cómo llevar a cabo la deliberación: discutiendo toda la prueba que se presentó, repasando los testimonios, discutiendo las opiniones que tuvieran y explicando las razones de esas opiniones con los compañeros que tuvieran una opinión distinta. En fin, los invitó a realizar lo posible por llegar a un veredicto unánime.

Lejos de constituir una presión indebida, dichas instrucciones reflejan una exhortación razonable a continuar el proceso deliberativo propio del sistema de jurado. De hecho, la Corte

---

[9] *Id.*, págs. 1125-1130.

Suprema de Estados Unidos validó en *Allen v. United States.*, supra, unas instrucciones que indicaban que en algunos casos no se podía esperar una certeza absoluta; que era su deber decidir el caso si podían hacerlo en conciencia, y que exhortaban a los jurados a escuchar los argumentos de sus compañeros, reconsiderar sus posturas y continuar deliberando con miras a alcanzar un veredicto.

A la luz de lo anterior, concluimos que las instrucciones impartidas por el foro primario en el caso ante nos —en un momento en que no existía evidencia de un verdadero *impasse*— no resultaron coercitivas ni violaron las garantías constitucionales aplicables.

En consecuencia, determinamos que el foro primario no cometió el primer error señalado por el apelante.

De otro lado, el señor Vega Figueroa cuestiona, en los señalamientos de error segundo y tercero, el hecho de haber sido encontrado culpable, a pesar de que, a su juicio, no se logró probar más allá de duda razonable los hechos alegados.

Para ello, alega en el segundo señalamiento de error que la investigación llevada a cabo fue deficiente; que el testimonio de la víctima presentó incongruencias y datos inverosímiles o poco creíbles; y que, además, varias personas testificaron sobre su buena reputación. En particular, debate que la víctima no precisara la ropa que llevaba puesta ni el tiempo que duraron los actos; que no explicara qué hizo el apelante con la ropa al momento de cometer los hechos; que nunca viera el pene del señor Vega Figueroa; que ni la víctima ni el apelante mostraran signos de violencia o moretones provocados durante los actos; que la víctima no presentara sangrado; que no demostrara ninguna señal emocional psicológica, como disminución en sus calificaciones escolares; que nunca hubiera acudido al pediatra ni tomara medicamentos; que nadie escuchara ni interviniera durante los hechos; que la víctima permaneciera en la cama luego de que el acto fuera interrumpido

por un ruido; que la familia hubiera cenado junta después de los actos; que la víctima se hubiera tardado en informar lo sucedido y que su madre no se hubiera dado cuenta de los hechos entre otros cuestionamientos.

Por su parte, en el tercer señalamiento de error el apelante cuestiona el valor probatorio de los peritos presentados y argumenta que estos no corroboraron la versión de la víctima. Específicamente, sostiene que la prueba pericial no demostró la ocurrencia de las supuestas agresiones sexuales ni que estas hubieran sido cometidas por el apelante.

En cambio, la Oficina del Procurador General alega que la prueba presentada sí demostró, más allá de duda razonable, la culpabilidad del apelante. Impugna que este presentara extractos de la transcripción oral estipulada, lo cual, a su juicio, no refleja adecuadamente el panorama completo de la prueba desfilada. Asimismo, indica que la tardanza en la investigación estuvo justificada y que, como consecuencia de esta, el señor Vega Figueroa no sufrió detrimento alguno.

De otro lado, en cuanto a los distintos cuestionamientos planteados por el apelante, alega que, al momento de ocurrir los hechos, E.V.V. tenía de ocho (8) a once (11) años, y que cuando testificó ya habían transcurrido más de diez (10) años. En ese sentido, expuso que, según los peritos que declararon en el juicio, la memoria de la víctima puede presentarse de manera fragmentada como consecuencia de la naturaleza traumática de los actos y del hecho de que estos fueron cometidos por su propio padre. Por ello, arguye que no necesariamente ella podía precisar todos los detalles de los eventos.

A la luz de lo anterior, la Oficina del Procurador General indica que corresponde examinar todas las circunstancias del caso. Además, explica que la hermana menor no escuchó los actos porque

no se encontraba en la casa; que la víctima no reveló lo ocurrido con anterioridad debido a las amenazas recibidas; que el hecho de que la víctima no presentara bajo aprovechamiento académico constituye únicamente un posible indicador de abuso sexual, el cual no es determinante; que el hecho de que la víctima haya tenido sexo oral con su novio no excluye que el señor Vega Figueroa la haya agredido sexualmente; que el hecho de que la víctima no haya acudido al pediatra tampoco descarta la ocurrencia de los actos; y que los testigos de reputación presentados indicaron que no podían precisar los detalles internos de la vida familiar.

Al examinar de forma minuciosa cada una de las alegaciones del señor Vega Figueroa, nos es forzoso concluir que estas responden a su insatisfacción con la credibilidad que el jurado otorgó a los testimonios presentados en el juicio. En ese sentido, es norma reiterada que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador, por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre **la existencia de pasión, prejuicio, parcialidad o error manifiesto**. Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o cuando esta **sea inherentemente imposible o increíble**.

No obstante, el señor Vega Figueroa no ha alegado ni ha demostrado que el jurado haya actuado de esa manera.

Según surge de la prueba presentada en el juicio, el señor Vega Figueroa, exagente de la policía,[10] es el padre de E.V.V., quien la adoptó cuando era una niña de seis (6) o siete (7) años.[11] A los ocho (8) años empezaron los abusos sexuales del primero a la menor.[12] Hubo varios eventos, durante varios años, hasta que ella

---

[10] TPO, Tomo 1, pág. 27, líneas 22-25.

[11] TPO, Tomo 1, pág. 23, líneas 7-8; pág. 102, líneas 21-47; pág. 137, líneas 35-37; pág. 183.

[12] TPO, Tomo 1, pág. 23, líneas 10-11; Tomo 2, pág. 887, líneas 26-29.

cumplió los once (11) años.[13] El primer evento ocurrió un día cuando E.V.V. salió de la escuela y llegó a la casa.[14] Allí iba a hacer sus tareas. En eso, el señor Vega Figueroa la llamó a su cuarto y llevó a cabo los actos de penetración sexual.[15] En un momento dado se escuchó un ruido, por lo que el apelante se levantó y verificó en la sala.[16] El señor Vega Figueroa regresó y continuó con la penetración sexual, hasta que llegó la mamá a la casa.[17] En ese momento, le dijo a la menor que parara de llorar, que se callara, sino le iba a ir peor.[18] Tras ello, E.V.V. se fue a su cuarto.[19] Allí su madre la saludó y le dio un abrazo.[20]

En los eventos, el señor Vega Figueroa le decía a E.V.V., mientras ella lloraba, que se callara y no dijera nada, que si no la iba a matar a ella y a su mamá.[21]

En otra ocasión, cuando E.V.V. tenía diez (10) años, ella estaba en la casa haciendo las tareas. El señor Vega Figueroa entró a su cuarto, la agarró por el brazo y la llevó al cuarto matrimonial.[22] La hermana estaba en el baño.[23] Allí llevó a cabo otra penetración

---

[13] TPO, Tomo 1, págs. 70 y 139; pág. 339, líneas 42-43; pág. 354, líneas 32-52; Tomo 2, pág. 661, líneas 11-15; pág. 671, líneas 12-13; pág. 858, líneas 27-28.

[14] TPO, Tomo 1, pág. 23, líneas 16-17.

[15] TPO, Tomo 1, pág. 23, líneas 15-46; pág. 109, líneas 14-26; pág. 138, líneas 1-37; págs. 219, 222-223, 225, 264-265, 268-270, 279, 282 y 284; Tomo 2, pág. 556, líneas 34-35; págs. 566-567, 569, 603-604 (testimonio de la Dra. Linda Lara García únicamente expresando que la testigo tuvo algún tipo de penetración); pág. 668, líneas 31-50; pág. 669, líneas 3-15; pág. 672, líneas 12-14; pág. 856, línea 1-15; pág. 865, líneas 6-13.

[16] TPO, Tomo 1, pág. 23, líneas 33-38; pág. 138, líneas 8-10, 39-43; págs. 230, 237, 282, 284 y 288; Tomo 2, pág. 669, línea 18; pág. 672, líneas 16-18; pág. 865, líneas 20-23.

[17] TPO, Tomo 1, pág. 23, líneas 48-52; págs. 25, 138, líneas 13-21, 45-50; págs. 230, 236, 282, 284, 288 y 290; Tomo 2, pág. 669, líneas 18-31; pág. 672, líneas 16-17.; pág. 865, líneas 22-27.

[18] TPO, Tomo 1, pág. 138, líneas 16-19; págs. 295-297.

[19] TPO, Tomo 1, pág. 298, líneas 34-36; Tomo 2, pág. 669, líneas 31-32.

[20] TPO, Tomo 1, pág. 24, líneas 3-5; págs. 301-303; Tomo 2, pág. 670, líneas 11-16, 40-42.

[21] TPO, Tomo 1, pág. 24, líneas 17-29; pág. 142, líneas 42-47; pág. 352, líneas 46-51; págs. 357-360; Tomo 2, pág. 591, líneas 5-19; pág. 859, líneas 42-45; pág. 889, líneas 16-20.

[22] TPO, Tomo 1, pág. 327, líneas 48-49; págs. 390-391.

[23] TPO, Tomo 1, pág. 113, líneas 27-35; págs. 326 y 394.

sexual.[24] Durante el evento se escuchó un ruido, por lo que el apelante se fue, pero al regresar, continuó.[25] En ese momento, ella vio a la vecina por la ventana y trató de tocar la ventana, pero el apelante se lo impidió.[26] Luego, durante el acto, se escuchó otro ruido, por lo que el apelante culminó y la envió a su cuarto. En el baño, al orinar, se percató que estaba sangrando.[27] Estando en el baño, su mamá llegó a la casa.[28]

En otra ocasión, el apelante la trepó encima del lavamanos del baño y cometió los actos sexuales.[29]

Otro evento ocurrió cuando ella tenía diez (10) años. Estaba enrollada en la corcha de su cuarto. El señor Vega Figueroa llegó al cuarto, le pegó contra la cama y llevó a cabo la penetración sexual.[30] Entonces, ella le indicó que escuchó un ruido, él salió y ella cerró la puerta con seguro, por lo que no pudo entrar.[31]

Posteriormente, cuando E.V.V. era más grande, es decir, luego de los doce (12) años, ella empezó a defenderse para evitar que la agrediera sexualmente.[32]

El último evento fue cuando E.V.V. tenía diecinueve (19) años. En esa ocasión, ella estaba en el cuarto acostada en la cama, cuando sintió que le tocaron el muslo y los glúteos. Al levantarse observó al señor Vega Figueroa. Tras ello, ella llamó a su entonces novio. En consecuencia, el apelante la dejó quieta. El novio la buscó y se

---

[24] TPO, Tomo 1, págs. 139-140; pág. 320, líneas 30-51; págs. 322, 325 y 334.

[25] TPO, Tomo 1, pág. 24, líneas 19-20; pág. 25, líneas 36-39; pág. 107, líneas 3-10; pág. 140, líneas 19-22; págs. 409 y 416; Tomo 2, pág. 556, líneas 34-35 (testimonio de la Dra. Linda Lara García haciendo referencia a la entrevista de E.V.V., pero en las págs. 586, 600 y 611 indicó que su evaluación médica no demostró que hubiera penetración anal); págs. 674-675, 858 y 921.

[26] TPO, Tomo 1, pág. 409; Tomo 2, pág. 674, líneas 26-35; pág. 859, líneas 27-36.

[27] TPO, Tomo 1, pág. 140, líneas 28-36.

[28] TPO, Tomo 1, pág. 140, líneas 38-51.

[29] TPO, Tomo 1, pág. 25, líneas 34-36; pág. 65; Tomo 2, pág. 915.

[30] TPO, Tomo 1, pág. 143, líneas 4-17; págs. 458-462, 464; Tomo 2, págs. 676-677 y 825.

[31] TPO, Tomo 1, pág. 143, líneas 17-26; págs. 467, 469-470; Tomo 2, pág. 672, líneas 17-24; págs. 826-828.

[32] TPO, Tomo 1, pág. 25, líneas 19-33; pág. 144, líneas 36-42; pág. 146.

fueron. Ya el novio sabía de toda la situación, quien le había dicho que se lo dijera a su madre.[33] Posterior a ese evento, en otro momento le contó la situación a su mamá.[34]

Los hechos antes indicados demuestran que el señor Vega Figueroa llevó a cabo actos de agresión sexual contra su hija, E.V.V. Por el contrario, el apelante intenta cuestionar lo anterior mediante diversas alegaciones en las que impugna ciertos aspectos de los testimonios de los testigos. No obstante, dichas omisiones o aparentes contradicciones correspondía evaluarlas al jurado, quien se encontraba en mejor posición para apreciar la prueba desfilada, al tener la oportunidad de observar y escuchar directamente a los testigos. En consecuencia, su apreciación merece gran respeto y deferencia. Correspondía a dicho jurado resolver los asuntos de credibilidad y determinar el valor probatorio de los testimonios, ponderando las contradicciones, de existir algunas.

El hecho de que la víctima no precisara la ropa que llevaba puesta durante los eventos ni el tiempo que duraron los actos; que no expusiera qué hizo el apelante con la ropa al momento de cometer los hechos; que no hubiera visto el pene del señor Vega Figueroa; que no presentara signos visibles de violencia, tales como moretones; que no presentara sangrado; que no evidenciara señales emocionales o psicológicas, como una disminución en sus calificaciones escolares; que nunca hubiera acudido al pediatra ni tomara medicamentos; que nadie escuchara o interviniera en los momentos en que ocurrieron los hechos; que permaneciera en la cama luego de que el acto fuera interrumpido por un ruido; que la familia hubiera cenado junta después de los actos; que se hubiera tardado en informar lo sucedido, y que su madre no se hubiera

---

[33] TPO, Tomo 1, págs. 25-26, 65, 82, 148-149, 161, 164, 509-512, 521-522; Tomo 2, pág. 618, líneas 41-52; págs. 622-623, 640-642, 681-682, 684, 925 y 927.
[34] TPO, Tomo 1, pág. 26, líneas 17-38; págs. 146-147.

percatado de los hechos, no demuestra la existencia de dudas serias, razonables y fundadas sobre la culpabilidad del apelante.

Tampoco satisface dicho estándar el hecho de que los peritos no establecieran médicamente y de forma directa que E.V.V. fue agredida sexualmente por el apelante cuando tenía ocho (8) años. En ese sentido, es importante recalcar que, desde *Comisión Asuntos de la Mujer v. Srio. de Justicia*, 109 DPR 715 (1980), el Tribunal Supremo de Puerto Rico descartó la necesidad de corroboración del testimonio de la víctima en casos de esta naturaleza. Por consiguiente, el argumento del apelante de que los peritos y los agentes investigadores no lograron corroborar el testimonio de la víctima tampoco encuentra apoyo en nuestro ordenamiento jurídico. Para sostener la determinación del jurado sobre la culpabilidad del señor Vega Figueroa, no era necesario que los peritos concluyeran de manera directa, ni basados exclusivamente en los análisis médicos, que el apelante perpetró la agresión sexual.

No obstaste, la realidad es que estos sí testificaron que encontraron laceraciones en el himen de la víctima, lo que evidencia violencia sexual provocada por una penetración de su área genital, consistente con el historial relatado. [35] Por otro lado, no se observaron laceraciones en el ano, lo cual se explicó como consecuencia de que esta área está rodeada de músculos que permiten que una penetración no necesariamente produzca trauma en el tejido. Por tanto, la ausencia de lesión no descarta que hayan ocurrido los actos alegados.[36]

Por último, la entrevista forense concluyó que las declaraciones de E.V.V. se contextualizaron dentro de un proceso de naturaleza de abuso sexual. [37] A esos efectos, resulta pertinente

---

[35] TPO, Tomo 2, págs. 566-567, 569 y 603-604.
[36] TPO, Tomo 2, págs. 600 y 610-611.
[37] TPO, Tomo 2, págs. 855 y 861.

hacer referencia a la Regla 110 de Evidencia, *supra,* la cual establece que para probar un hecho no se exige un grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza. Asimismo, dispone que el testimonio directo de una persona testigo que merezca entero crédito constituye prueba suficiente de cualquier hecho, el cual puede demostrarse mediante evidencia directa o mediante evidencia indirecta o circunstancial.

Por consiguiente, este tribunal concluye que el señor Vega Figueroa tampoco tiene razón en sus señalamientos de error segundo y tercero.

**-IV-**

Por los fundamentos previamente expuestos, se **confirma** la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones